IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 15, 2015 at Knoxville

**STATE OF TENNESSEE v. GERALD HOBBS**

**Appeal from the Circuit Court for Lewis County**
**No. 2013-CR-38     James G. Martin, III, Judge**

---

**No. M2014-02129-CCA-R3-CD – Filed December 11, 2015**

---

The defendant, Gerald Hobbs, was convicted of one count of assault and one count of aggravated assault, while an order of protection was in effect, upon his former girlfriend and sentenced to an effective term of four years imprisonment.  On appeal, he argues that the evidence is insufficient to sustain the convictions, that the trial court erred by not instructing the jury as to self-defense, and that the court erred in sentencing.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Richard Boehms, Centerville, Tennessee, for the appellant, Gerald Hobbs.

Herbert H. Slatery III, Attorney General and Reporter; Andrew C. Coulam, Assistant Attorney General; Kim R. Helper, District Attorney General; and Jessica N. Borne, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

Deputy Scotty Lyn Carroll of the Lewis County Sheriff's Department testified that on January 25, 2013, the victim came in and said she had been beaten up by the defendant two days earlier.  She said the defendant had been angry because she was late coming home and had not prepared dinner for him.  He began cursing her and would not allow her to get into the bed he was occupying.  He knocked her down, and into a piece of furniture, began choking her, and, throwing her on the bed, choked her and put a knife

to her throat. She had a cut on her right ear. The victim's son, Blake, witnessed some of the incident, got the defendant off the victim, and took the victim to the living room. He then went back to the bedroom to get the victim's cigarettes, and, when he returned, the defendant pointed at him a .380 pistol. The victim returned to the bedroom, and the defendant threatened to kill both of them. Her son and a friend got her into the living room and she then left the house, not to return. When the victim came into the sheriff's office, both of her eyes were black, she had a cut on her ear, bruises on her stomach, and was "pretty upset."

The victim testified that the defendant was her former boyfriend and that they had lived together with her two sons and his son, on occasion. The day of the incident, she had been with a female friend whose son had attempted to commit suicide, and she did not return home until 8:30 to 9:00 p.m. The defendant already was in their bed and would not allow her into it, after she had taken a shower. He was angry because she had not prepared his dinner. Every time she tried to lie down, the defendant rolled her out of the bed, snatched the blankets from her, or used different methods to keep her from the bed. After this had gone on for an hour, she heated soup for the defendant and took it, crackers, and tea into the bedroom for him. He told her this was not what he wanted and said that she was going to cook for him. She then continued trying to get into the bed, and the defendant prevented her from doing so. The victim tried to sleep using the pillows and blankets which already were on the floor, but the defendant snatched those away from her, as well.

Finally, between 3:00 and 3:30 a.m., the victim decided that if she could not sleep in her bed, the defendant "sure as hell wasn't going to sleep in it." The victim then removed her favorite pillow from the bed, returned with a butcher knife, and proceeded to cut up the pillows, as the defendant continued to lie in the bed. She did not cut up the defendant's side of the bed or approach him with the knife, according to her testimony. As she tried to cut the bed, the knife blade folded in half, and the defendant jumped up and hit her in the eye. She fell against the dresser and dropped the knife. The defendant then grabbed her by the hair and leaned her forward over the bed, hitting her at least twice, laying the knife on her throat, and, then, cutting her ear. Her oldest son came into the room, and the defendant threw up his hands, saying he had not touched the victim. Her other son and a friend came into the room and took her out. Her oldest son kicked open the then locked door to the bedroom to retrieve her cigarettes, and the defendant pointed a pistol at him. The victim then returned to the bedroom, and the defendant pointed the pistol at her. He told them they had "better go the f*** on or he would kill" them. They left the room, and the victim went to the living room. As far as the victim knew, the defendant had all of the cell phones and the keys to the vehicle. While the defendant was asleep, she entered the bedroom and used a cell phone to call her friend with whom she had spent the previous day. She told the defendant she had to go to the

store to buy cigarettes, and, when her friend arrived, the victim and all three of the boys left.

The victim said that, prior to the incident, she had obtained an order of protection against the defendant, and it ordered that he not "abuse, threaten to abuse, hurt or try to hurt or frighten [the victim] or any minor child under the age of 18." Additionally, it ordered that the defendant not talk or threaten to talk to the victim or minor child, or put them in fear of being hurt or not being able to leave. According to the order, it was served on the defendant on October 24, 2012. After the defendant was arrested and, then, released from jail, he began sending messages to the victim on Facebook, one promising he would not touch her again and that he wanted her to be happy with him. She said that she got back together with the defendant the following April because she believed she "didn't have a choice," explaining that his continuing telephoning and texting her caused her to believe that was the only way she "could try to live somewhat of a normal life." He later moved back in with her, but they broke up again the following November.

Blake Ivey, the victim's son, stated that he and his friend, Dallas, had returned to the victim's home about 4:30 p.m. on the afternoon of January 22, 2013. Around 1:00 a.m., the next morning, he was awakened by the victim's screaming in an adjacent bedroom. He ran to her room, as she called his name, kicked open the door, and saw the defendant choking her. The defendant "jumped back" and said he had not touched the victim. Mr. Ivey picked up the victim and "tossed her" to his friend, Dallas, to get her out of the room. As they were in the living room, he saw that the victim was red in the face and had "marks all over her neck." The victim said she wanted her cigarettes from the bedroom, so Mr. Ivey kicked open the door again, and the defendant jumped up from the bed and pointed a pistol at him, saying Mr. Ivey should leave the room or the defendant would kill him and the victim. After Mr. Ivey left, the defendant slammed and locked the bedroom door. None of them had telephones, so they stayed in the house until morning, when they got rides with others and left. Mr. Ivey looked through a crack in the door on several occasions and saw the defendant lying on the bed with the pistol beside him. Subsequently, the defendant returned to live in the house.

Dallas Meisenheimer testified that he knew the defendant as the ex-boyfriend of the victim, whose son was the best friend of the witness. The night of the incident, he had been asleep at the victim's house and was awakened by "[y]elling and arguing" between 1:00 and 2:00 a.m., when the victim called for her son, Blake. The witness followed Blake into the bedroom, where Blake pushed the victim into his hands to separate her from the defendant, who had his hands up, saying he did not "lay a hand on her." The victim's eye was a "little swolled up," and she had a "little mark on her neck." She appeared to be "[a]ggravated, sad." Blake returned to the bedroom to retrieve some cigarettes, and the defendant walked out with a gun in his hand.

3

The remainder of the testimony of this witness, as well as that of Gerald Andrew Hobbs II, is shown by the index as occupying pages 201-250 of the transcript, but these pages are not within the transcript included in the appellate record. However, for our review of the issues raised by the defendant, we conclude that these pages are not necessary.

## ANALYSIS

### I.  Sufficiency of the Evidence

On appeal, the defendant asserts that the evidence is not sufficient to show that "any bodily injury to the victim was caused intentionally, knowingly, or recklessly . . . or that the [d]efendant intended to injure the victim." The State responds that the defendant has waived this issue because certain pages of the trial transcript are missing from the record, and, even if this were not the case, the proof is easily sufficient to sustain the verdicts.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

A criminal offense may be established entirely by circumstantial evidence. State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010). It is for the jury to determine the weight to be given the circumstantial evidence and the extent to which the circumstances are consistent with the guilt of the defendant and inconsistent with his innocence. State v. James, 315 S.W.3d 440, 456 (Tenn. 2010). In addition, the State does not have the duty to exclude every other reasonable hypothesis except that of the defendant's guilt in order to obtain a conviction based solely on circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 380-81 (Tenn. 2011) (adopting the federal standard of review for cases in which the evidence is entirely circumstantial).

4

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

As related to this matter, the State was required, regarding the assault, to prove that the defendant intentionally or knowingly caused the victim to reasonably fear imminent bodily injury. Tenn. Code Ann. §§ 39-13-101(a)(2); -102(a)(1)(B), and regarding the aggravated assault while an order of protection was in effect, to prove that the defendant intentionally or knowingly committed an assault on the victim, as defined in section 39-13-101, and previously had been enjoined or restrained by an order, diversion, or probation agreement of a court of competent jurisdiction from in any way causing or attempting to cause bodily injury to her. Tenn. Code Ann. § 39-13-102(a)(2)(C).

At the trial of this matter, the victim testified that the defendant kicked her and pushed her from the bed they shared and, later, struck her about the face, blackening both of her eyes, and held a knife to her throat, threatening her. Additionally, the State presented proof showing that an order of protection, served upon the defendant prior to the incident, prohibited him from assaulting the victim. From this proof, we conclude that a reasonable jury easily could have concluded that the defendant both assaulted the victim and did so while an order of protection was in effect. Thus, this assignment is without merit.

5

## II. Self-Defense Instruction

The defendant argues that the trial court erred in denying the request to instruct the jury as to self-defense, describing the situation as his being unarmed and "facing a crazed victim with a deadly weapon." The State disagrees with this characterization of the incident, as do we.

"It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001) (citing State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000); State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990)). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). "In determining whether a defense instruction is raised by the evidence, the court must examine the evidence in the light most favorable to the defendant to determine whether there is evidence that reasonable minds could accept as to that defense." State v. Sims, 45 S.W.3d 1, 9 (Tenn. 2001). "When the entire charge, read as a whole, fully and fairly sets out the applicable law, the trial judge does not err in denying a special instruction requested by a party or in denying an inaccurate instruction or one inapplicable to the case at hand." Id.

Tennessee's statute on self-defense provides in pertinent part:

[A] person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b)(2).

We agree with the trial court that there was no evidence that the defendant's striking the victim, holding the knife to her throat, and cutting her ear were for his own

self-protection or that he was even fearful of her.  Accordingly, this assignment is without merit.

### III.  Sentencing

The transcript of the sentencing hearing shows that the trial court carefully weighed the sentencing considerations and imposed what the court believed to be an appropriate sentence.  In the sentencing decisions, the court relied upon the presentence report the testimony at the hearing, and the arguments of counsel.  The court concluded that the defendant was a Range I offender and that his sentence should be enhanced because of his previous criminal conduct.  Additionally, the court determined that enhancement factor (8) applied, because the defendant had not complied with the bond conditions of the order of protection, or with factor (9), the court's not finding the defendant to have been credible and concluding that a firearm had been involved in the matter.  As to count II, the court determined that the defendant had put a knife to the throat of the victim and, thus, enhancement factor (9) applied to sentencing for that offense.  Additionally, the court determined that the defendant's conduct did threaten serious bodily injury, so that the mitigating factor that he had not done so was not applicable.

In assessing the defendant's likelihood of benefitting from alternative sentencing, the court reviewed his numerous past failed suspensions of sentence:

> My point is that when you study [the defendant's] criminal history, the one consistent conclusion that you draw is that every judge that he's appeared before has suspended his sentence in whole or in part.  I mean no judge has finally said[,] Mr. Hobbs, we cannot continue to do this.  And I think that that's what figures into the sentencing consideration in the Court's mind as much, if not more, than anything else.  I am directed to consider measures least restrictive.  In other words, look at measures less restrictive than confinement were frequently or recently applied.  And that's what I've done.  Throughout the history of [the defendant], there's been one suspension after another.  I am to impose no sentence greater than that necessary.  I'm to avoid inequalities and I'm to look at the potential for rehabilitation, which I find in this case to be dismal.

Under the 2005 amendments to the sentencing act, a trial court is to consider the following when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2010).

The trial court is granted broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and "sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." State v. Bise, 380 S.W.3d 682, 706 (Tenn. 2012). Accordingly, we review a trial court's sentencing determinations under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707.

Under the revised Tennessee sentencing statutes, a defendant is no longer presumed to be a favorable candidate for alternative sentencing. State v. Carter, 254 S.W.3d 335, 347 (Tenn. 2008) (citing Tenn. Code Ann. § 40-35-102(6)). Instead, the "advisory" sentencing guidelines provide that a defendant "who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6).

A defendant shall be eligible for probation, subject to certain exceptions, if the sentence imposed on the defendant is ten years or less. Id. § 40-35-303(a). A defendant

8

is not, however, automatically entitled to probation as a matter of law. The burden is upon the defendant to show that he is a suitable candidate for probation. Id. § 40-35-303(b); State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). In order to meet this burden, the defendant "must demonstrate that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" State v. Bingham, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995) (quoting State v. Dykes, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)).

There is no bright line rule for determining when a defendant should be granted probation. Bingham, 910 S.W.2d at 456. Every sentencing decision necessarily requires a case-by-case analysis. Id. Factors to be considered include the circumstances surrounding the offense, the defendant's criminal record, the defendant's social history and present condition, the need for deterrence, and the best interest of the defendant and the public. Goode, 956 S.W.2d at 527.

In determining if incarceration is appropriate in a given case, a trial court should consider whether:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1). Furthermore, the defendant's potential for rehabilitation or lack thereof should be examined when determining whether an alternative sentence is appropriate. Id. § 40-35-103(5).

We agree with the State that the record supports the court's sentencing of the defendant. First, we note that the court carefully and at length considered the sentencing principles and applied them to the facts of the case. In fact, the defendant has a substantial criminal record, beginning apparently with a 1994 conviction for assault, for which he was found guilty and placed on probation. Since then, he has amassed a number of additional arrests, convictions, and probationary terms. As for the trial court's misapplication of enhancement and mitigating factors, we disagree with the defendant, for the record supports the court's determination in this regard. As to alternative

sentencing, the defendant has shown, many times over two decades, that a probationary sentence or partial service of a jail term does not deter his continuing criminal behavior. Accordingly, we conclude that the record supports the sentence imposed by the trial court.

## **<u>CONCLUSION</u>**

Based upon the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE